## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|                              |   |                              |
|------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA,    | : |                              |
|                   Plaintiff, | : |                              |
|                         v.   | : | Criminal Action No.11-88-MN  |
| DAVID GELLAD,                | : |                              |
|                   Defendant. | : |                              |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant David Gellad is currently serving a 180-month term of incarceration for coercing or enticing a fourteen-year-old girl to have sexual contact with him. Defendant now asks this Court to modify his sentence to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in light of the risk to his health posed by the ongoing COVID-19 pandemic. Defendant, however, has failed to meet his burden to show that any of his health conditions, even in light of the added risks presented by COVID-19, amount to "extraordinary and compelling reasons" for compassionate release. Defendant has been cancer free since before his conviction in this matter, his hypertension is adequately treated, and the medical records do not show that he has experienced asthma-related symptoms over the past several years. Moreover, consideration of the 18 U.S.C. § 3553(a) factors, including the serious nature and circumstances of the offense, independently weigh against Defendant's immediate release. This Court should deny Defendant's motion.

## I. BACKGROUND

### A. Defendant's Conviction and Sentence

Defendant, a Canadian citizen, came to the attention of authorities in the United States when the father of a then fourteen-year-old girl ("Doe") told Pennsylvania State Police ("PSP") troopers that he had discovered communications between an adult male, later identified as Defendant, and his daughter. Exhibit A (Presentence Investigation Report ("PSR") (filed under seal)) ¶ 10. Doe's parent's later told PSP that they believed Defendant had sexual contact with Doe at a hotel in Newark, Delaware over the weekend of June 3-5, 2011. PSR ¶ 10. PSP provided that information to investigators with the Department of Homeland Security Investigations and local authorities in Delaware. PSR ¶ 10.

The subsequent investigation revealed that Defendant had maintained an online relationship with Doe beginning in October 2010 – when Doe was just thirteen years old – and continuing through June 2011. PSR ¶ 11. Doe, during interviews with investigators, revealed that in those online communications Defendant expressed an interest in traveling to the United States for the purpose of having sex with her, encouraged Doe to send him sexually explicit pictures of herself (which she did), and sent sexually explicit pictures of himself to Doe. PSR ¶ 12. Law enforcement's investigation confirmed that Defendant did not only express an interest in traveling to the United States to meet with Doe. Defendant traveled to the United States twice – once in March 2011 and once in June 2011 – to have sexual contact with Doe. PSR ¶¶ 11-14. Doe confirmed that she had sexual contact with Defendant on both occasions.[1] PSR ¶¶ 13-15. As

---

[1] Doe advised investigators that a friend of hers – a fourteen-year-old boy – was aware of her relationship with Defendant. Doe reported, however, that Defendant provided alcohol to her friend in exchange for keeping Defendant's sexual relationship with Doe a secret. PSR ¶ 15.

2

recounted in a victim impact statement submitted by Doe's parents, Defendant's actions upended Doe's life.[2]  PSR ¶¶ 29-30.

Defendant was ultimately arrested on July 23, 2011, at the Highgate Springs Port of Entry in Vermont after he crossed into the United States.  PSR ¶ 2.  He was arrested based on an arrest warrant issued out of this District.

A Grand Jury for this District returned a three-count indictment against Defendant on September 6, 2011, charging him with one count of coercion or enticement of a minor, in violation of 18 U.S.C. § 2422(b) (Count One), and two counts of travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) (Counts Two and Three).  (D.I. 15.)

On October 11, 2012, Defendant pleaded guilty to Count One of the indictment, coercion or enticement of a minor.  (D.I. 32.)  The Court later dismissed Counts Two and Three of the indictment upon the government's motion.  (D.I. 48, 59.)  The Court sentenced Defendant to a 180-month term of imprisonment, 120 months of which were mandatory.  (D.I. 60.)  The Court also imposed a five-year term of supervised release.  (D.I. 60.)  That supervised release, however, is required "to run inactively" when Defendant returns to Canada.  (D.I. 60.)

Defendant has been incarcerated since his arrest on July 23, 2011.  PSR ¶¶ 2, 5. Defendant's projected release date is not for another three and a half years.  *See* Exhibit B (BOP Sentence Monitoring Computation Report listing an anticipated release date of May 3, 2024) (filed under seal).

### B. Defendant's Request for Compassionate Release

Defendant is presently incarcerated at the Federal Correctional Institute-Gilmer ("FCI-

---

[2] The victim impact letter was submitted to the Court under seal.  The PSR contains one sentence that captures the nature of the letter:  "Lost forever is her innocence and a part of her childhood she will never get back.  She was forced to become an adult much too fast."  PSR ¶ 30.

Gilmer"). As of November 30, 2020, statistics maintained by the BOP reported that FCI-Gilmer had 19 active positive COVID-19 cases among inmates and 4 active positive COVID-19 cases among staff.[3]

On July 8, 2020, Defendant submitted a compassionate release request to the Warden of FCI-Gilmer based on his medical conditions in light of the COVID-19 pandemic. Exhibit C at pp. 4-10 (Defendant's compassionate release request to Warden) (filed under seal).[4] In that request, Defendant argued that he was at increased risk of complications from COVID-19 because he had high blood pressure and a weakened immune system due to his past thyroid cancer. Exhibit C at p. 4. He also noted that he was "pre asthmatic" and that he had demonstrated "exemplary behavior" during the period of his incarceration. Exhibit C at p. 4. The Warden denied his request on July 23, 2020, noting that Defendant had not presented "extraordinary or compelling reasons" to justify his release. Exhibit C at p. 1 (Warden's Denial). The Warden also noted that the BOP was taking extraordinary measures regarding the management of COVID-19 in its facilities. Exhibit C at p. 1.

In August 2020, following the Warden's denial of Defendant's request for compassionate release, Defendant filed a motion in this Court seeking the appointment of counsel to represent him with filing a motion for compassionate release. (*See* D.I. 64.) On November 16, 2020, Defendant, through counsel, filed the pending motion.

Defendant's pending motion relies largely on the fact that COVID-19 is a dangerous illness and that the incarcerated population is at particular risk for contracting COVID-19, and suffering

---

[3] *See* https://www.bop.gov/coronavirus/index.jsp (last accessed November 30, 2020).

[4] The government's pincites to its exhibits refer to the PDF page number of the exhibit, which counts the cover page as "page 1."

4

adverse consequences from the illness, due to conditions inherent in the prison setting. (*See generally* D.I. 68 at 7-11.) Defendant also argues that his history of thyroid cancer, hypertension (high blood pressure), and asthma present extraordinary and compelling reasons for his release in light of COVID 19. (*See* D.I. 68 at 2, 11.)

      **C.**      **BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the BOP has taken significant measures to protect the health of the inmates in its charge by implementing a Coronavirus (COVID-19) Action Plan that significantly modifies its operations to minimize the risk of COVID-19 transmission into and inside its facilities.[5] In early March, BOP began to modify its operations, in accordance with the Action Plan. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis. The BOP continues to follow and incorporate every Center for Disease Control ("CDC") precaution into its operational plans.

The current Action Plan seeks to maximize social distancing within the facilities, to the extent possible, limiting inmate movement and group gatherings. All staff and inmates have been given appropriate face coverings and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. All newly-arriving BOP inmates are processed through quarantine or jail/detention sites and screened for COVID-19 exposure risk factors and symptoms, as well as tested for COVID-19. Even asymptomatic inmates with a negative COVID-19 test are quarantined for at least 14 days. Asymptomatic new inmates who remain asymptomatic

---

[5] Full details regarding BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

for 14 days are tested again for COVID-19 and only transferred to the general population after receiving a second negative test result. Further, BOP screens all inmates for COVID-19 symptoms prior to any transfer between facilities; those who display symptoms are not transferred and are instead quarantined. All staff and visitors are screened for COVID-19 symptoms and denied access if they register a temperature of 100.4 degrees or higher. BOP has also limited visitation within its facilities.[6] Likewise, all non-essential official staff travel has been cancelled, as has most staff training.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General ("AG") issued a memorandum directing the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. In assessing whether home confinement should be granted pursuant to the AG's memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and a non-exhaustive list of discretionary factors. This includes: (a) the age and vulnerability of the inmate to COVID-19, in accordance with CDC guidelines; (b) the security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities; (c) the inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment; (d) the

---

[6] Social and volunteer visits have recently been reinstated across BOP facilities with socially-distanced parameters, symptom and temperature screening, and appropriate hygiene and disinfection protocols in place. The availability of social and volunteer visits varies by institution and depends on institutional resources and local COVID-19 conditions.

inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment; (e) whether the inmate has a demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility; and (f) the inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.

Currently, BOP is prioritizing home confinement for inmates that have served at least 50% of their sentences or those who have fewer than 18 months remaining on their sentences and have served at least 25% of their sentences. On April 3, 2020, the AG gave the Director of BOP the authority to exercise discretion granted by Congress through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136 (2020), to designate inmates for home confinement for an indefinite period of time, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, BOP has designed all of these measures to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. Nevertheless, BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider

7

the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II. LEGAL FRAMEWORK

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g., United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. An incarcerated person must

exhaust administrative remedies before petitioning the Court for compassionate release. The First Step Act amended 18 U.S.C. § 3582 to permit inmates in specified circumstances to file motions in court seeking "compassionate release." Under the First Step Act, an inmate may file a motion requesting compassionate release only after filing a request for compassionate release with the BOP and either exhausting the administrative review of the denial of the request or waiting thirty days from the date of the request, whichever occurs first. 18 U.S.C. § 3582(c)(1)(A).

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[7] Or, as Judge

---

[7] Although the policy statement refers only to motions filed by the BOP Director, the First Step Act—which authorized defendants to file motions under § 3582(c)—was enacted on December 21, 2018, after the policy statement's last amendment on November 1, 2018. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the

Andrews explained the framework recently, a defendant must (1) exhaust administrative remedies; (2) show extraordinary and compelling circumstances; (3) show an absence of dangerousness; and (4) show that the section 3553(a) factors support a reduced sentence. *United States v. Butler*, No. 16-cr-54, 2020 WL 3207591, at *2 (D. Del. June 15, 2020).

With respect to the second prong, the policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons," including, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1 (A). Those categories include: (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id*. If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies),[8] the court must deny the motion.

---

policy statement applies to motions filed by defendants as well.

[8] The application note sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Those are not at issue here. The note also recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

## III. <u>ARGUMENT</u>

Defendant's motion seeks a sentence reduction to a sentence of time-served. (D.I. 68 at 1.) In support of his request, Defendant cites the same medical conditions he raised in his request with the BOP: a history of thyroid cancer, hypertension, and asthma. Defendant also justifies his request for immediate release by arguing that the incarcerated population is uniquely susceptible to COVID-19 and referencing his model behavior while in prison. (D.I. 68 at 7-14.) Defendant's arguments are unavailing. Defendant's medical conditions do not rise to the level of an extraordinary and compelling reason to release him, even in light of COVID-19. Nor do Defendant's remaining arguments entitle him to relief.

### A. Defendant's Health Conditions, Even in Light of COVID-19, Do Not Constitute "Extraordinary and Compelling" Reasons to Modify His Sentence.[9]

Compassionate release is only appropriate for a narrow class of defendants—even during a pandemic. As the United States Court of Appeals for the Third Circuit has explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (non-precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). Classifying COVID-19 alone as an extraordinary and compelling reason to revisit otherwise legal and final sentences would not only contravene the text of § 3582 and the policy statement, but would also be detrimental to BOP's organized and

---

[9] As Defendant's pending motion was filed over thirty days after Defendant submitted his request for compassionate release and was denied by the Warden, Defendant has met the exhaustion requirement of the compassionate release statute.

comprehensive anti-COVID-19 protocols, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions. Even during a pandemic, the applicable legal framework contemplates compassionate release for specific individuals suffering from narrow categories of medical conditions, not the widespread prophylactic release of inmates and the modification of otherwise lawful sentences.

The government, however, does not suggest that COVID-19 is irrelevant to the Court's analysis. If an inmate has a chronic medical condition identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." *See* Centers for Disease Control, *People Who Are at Increased Risk for Severe Illness* at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last accessed November 19, 2020). Under those circumstances, a chronic condition (i.e., one "from which [the defendant] is not expected to recover") could reasonably be found to be "serious" and to "substantially diminish [] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent COVID-19. U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I). But, as a part of its analysis, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

Here, Defendant does not suffer from a medical condition that falls within one of the categories specified in the application note to the Sentencing Guidelines, such as metastatic cancer, ALS, end-stage organ disease, or advanced dementia. *See* U.S.S.G. § 1B1.13, cmt. n.1(A)(i). And

although the CDC has determined that certain conditions increase the risk of severe illness from exposure to COVID-19, none of Defendant's conditions are on the CDC's list.[10] The CDC has also concluded that people with certain conditions, including hypertension and "moderate-to-severe" asthma, "*might* be at an increased risk" for severe illness from COVID-19. The CDC has stated that due to "limited data and information," it cannot definitively conclude that those conditions increase the risk of severe illness.

Defendant primarily argues that he is "particularly vulnerable to COVID-19" due to his past history of thyroid cancer and the surgical removal of lymph nodes from his left neck. (D.I. 68 at 11.) Defendant, however, has provided no basis in fact to suggest that either his cancer history or the removal of lymph nodes from his left neck increases his risk of severe illness from COVID-19. Although the CDC recognizes that "[h]aving cancer *currently* increases your risk of severe illness from COVID-19," the CDC has stated that "it is not known whether having a history of cancer increases your risk." And, although Defendant states that his lymph node removal has resulted in a "seriously weaken[ed] immune system" (D.I. 68 at 2), he has not provided any medical records or scientific studies to support that assertion. According to the American Cancer Society, "[r]emoving lymph nodes during cancer surgery is highly unlikely to weaken a person's immune system, since the immune system is large and complex and is located throughout the body."[11] Moreover, the CDC only recognizes an immunocompromised state as a condition that "might" increase someone's risk of severe illness from COVID-19, not a condition that does

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed November 19, 2020).

[11] American Cancer Society, *Lymph Nodes and Cancer*, https://www.cancer.org/cancer/cancer-basics/lymph-nodes-and-cancer.html.

increase one's risk. And, even then, lymph node removal is not a condition the CDC lists as potentially resulting in a weakened immune system.[12]

Moreover, Defendant's medical records reflect that the BOP regularly monitors and treats his thyroid condition and screens him for the potential recurrence of cancer. *See generally* Exhibit D (Defendant's medical records provided by FCI-Gilmer) (filed under seal). And Defendant does not appear to dispute that. (*See* D.I. 68 at 2 ("He is currently treated with high dose thyroid medication and is regularly screened for cancer recurrence.").) Although Defendant's medical records reflect that he has felt "new nodules" over the past twelve months, the records reflect that testing has shown the nodules are "most likely residual thyroid tissue, not [a] tumor." Exhibit D at p. 13 (medical encounter notes dated October 25, 2019); *see also* p. 50 (ultrasound report dated November 5, 2019, noting that "mass in the right neck . . . could be a lymph node"). There is no indication in the medical records that Defendant's cancer has returned. By all accounts, Defendant has been cancer free since prior to his incarceration.

Defendant also points to his hypertension as an "extraordinary and compelling" reason to grant his release. (D.I. 68 at 2, 11.) The government does not dispute that Defendant has hypertension. But, as referenced above, hypertension is not a condition identified by the CDC as increasing a person's risk for developing serious illness from COVID-19. Moreover, Defendant's medical records show that he gets regular and effective treatment to manage his blood pressure. *See generally* Exhibit D (demonstrating that Defendant receives medications to treat his

---

[12] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed November 19, 2020) (listing "having a solid organ transplant, blood, or bone marrow transplant; immune deficiencies; HIV; with a low CD4 cell count or not on HIV treatment; prolonged use of corticosteroids; or use of other immune weakening medicines" as "conditions and treatments" that could "cause a person to be immunocompromised or have a weakened immune system").

hypertension, including Diltiazem and Aspirin). There is no indication from Defendant's medical records, and Defendant does not suggest, that the BOP is unable to manage his hypertension. Nor do Defendant's medical records show that his well-managed hypertension has resulted in Defendant experiencing an adverse health episode in the recent past. Defendant's well-treated and well-controlled hypertension does not amount to an extraordinary and compelling reason for release. *See United States v. Leonard*, No. 16-75, 2020 WL 3207085, at *3 (D. Del. June 15, 2020) ("Defendant's increased risk of getting very sick from COVID-19 appears at most to be minimally increased over that of a person without hypertension. Thus, in my opinion, he does not have such health issues as to demonstrate 'extraordinary and compelling circumstances,' even when combined with the on-going COVID-19 pandemic, and thus, he does not qualify for compassionate release."); *accord United States v. Roy*, No. 18-62, 2020 WL 5821721, at *3 (D. Del. Sept. 30, 2020); *see also United States v. Thornton*, No.18-167, 2020 WL 4368155, at *4-*5 (W.D. Pa. July 29, 2020) (explaining that hypertension does not rise to an extraordinary and compelling release meriting release even when an inmate is housed at a facility with a significant number of inmates testing positive for COVID-19); *United States v. Moore*, No. 19-101, 2020 WL 4282747, at *3-*5 (D.N.J. July 27, 2020) (denying release for defendant with Type II diabetes, obesity, epilepsy, COPD, and hypertension because conditions are well-controlled, BOP's efforts to mitigate spread of the virus, and defendant's criminal history, despite only four months left on sentence); *United States v. Hammond*, No. 18-184, 2020 WL 2126783, at *5 (W.D. Pa. May 5, 2020) (denying compassionate release, noting defendant's blood pressure is regularly tested and he is receiving medication); *United States v. Paul*, No. 15-48, 2020 WL 2539269, at *1 (D. Minn. May 19, 2020) (hypertension was not extraordinary and compelling reason for compassionate release for 40-year-old overweight defendant).

Defendant next highlights his asthma as a basis to grant his request to reduce his sentence. (*See* D.I. 68 at 2, 11.) The CDC states that asthma, but only asthma that is "moderate-to-severe," "may" increase the risk for severe illness from COVID-19.[13] Nothing in Defendant's medical records suggest that he has moderate to severe asthma. To the contrary, Defendant described his condition in his compassionate release request to the Warden of FCI-Gilmer as "pre asthmatic." Exhibit C at p. 4. And his medical records do not show any recent health problems having to do with asthma. The records reflect a diagnosis of asthma in December 2017, *see* Exhibit D at p. 30, and certain respiratory infections in 2014, 2015, and 2016, *see* Exhibit D at p. 31. There is no other indication in the medical records that Defendant is currently suffering from any asthma-related condition, let alone a condition that could be considered "moderate-to-severe" asthma. Because Defendant's medical records do not "show him to have 'moderate to severe asthma,'" he is not "at any substantially greater risk for complications from COVID-19 than a completely healthy individual in prison." *United States v. Butler*, No. 16-54-RGA, D.I. 41 (D. Del. June 15, 2020). And even if Defendant could be described as having "moderate" asthma, "[i]n light of the CDC recommendations that asthma may only possibly increase a person's risk of severe illness from COVID-19," Defendant's asthma "does not present an extraordinary and compelling reason to reduce his sentence." *United States v. Freedland*, No. 15-175, 2020 WL 4926542, at *4 (E.D. Pa. Aug. 21, 2020); *see also generally United States v. Vurgich*, No. 18-34, 2020 WL 4335783, at *4 (D. Del. July 28, 2020); *United States v. Elliott*, No. 17-51, 2020 WL 5517461, at *4 (D.N.J. Sept. 14, 2020) (CDC no longer includes asthma on list of conditions that are known to increase the risk of severe illness from COVID and medical records do not show defendant is suffering

---

[13] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#asthma.

from any severe complications due to asthma); *United States v. Jackson*, No. 14-274, 2020 WL 5424003, at *2 (W.D. Pa. Sept. 10, 2020) (medical records showing treatment for shortness of breath due to asthma exacerbation "do not support a finding that Defendant's asthmatic condition is so severe so as to create an extraordinary and compelling reason to reduce his sentence").

Last, Defendant's suggestion that the conditions in BOP facilities alone is a sufficient basis to grant his immediate release ignores the Third Circuit's statement that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Rae*, No. 15-432, 2020 WL 4544387, at *4 (E.D. Pa. Aug. 6, 2020) ("In the absence of individualized risk, COVID-19, on its own, is not enough to justify compassionate release."). Moreover, the BOP website tracing COVID-19 statistics reflects that FCI-Gilmer is taking appropriate precautions to limit the spread of COVID-19 and is adequately addressing any outbreaks that do occur. When Defendant filed his motion, FCI-Gilmer had reported 79 active COVID-19 cases among inmates. (D.I. 68 at 1.) That number is now down to 19 active cases among inmates.[14] *See supra* p. 4 & n.3.

The bottom line is that Defendant's medical situation is stable and effectively managed. Ultimately, Defendant falls outside of the categories of defendants meriting compassionate release outlined in the Guidelines policy statement because his medical problems do not "substantially diminish […] [his] ability […] to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13, cmt. n.1 (A). Under the particular circumstances of this case, Defendant cannot demonstrate extraordinary or compelling circumstances. Accordingly, this

---

[14] Defendant's citations for the proposition that many prisons lack basic medical supplies, such as masks, hand sanitizers, and soap, appeared in publications in March and April, when such supplies were in short-supply across the country.

Court should deny his motion.[15]

### B. The 18 U.S.C. § 3553 Factors Strongly Weigh Against Defendant's Release.

Alternatively, Defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he merits release under the § 3553(a) factors. In order to afford Defendant relief, the Court must also find that Defendant is not dangerous and that the sentencing factors set forth in 18 U.S.C. § 3553(a) support a reduced sentence. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *Vurgich*, 2020 WL 4335783 at \*4 (noting that because Court did not find medical conditions constituted extraordinary and compelling circumstances, Court "need not consider the third and fourth steps in the analysis."). Here, Defendant fails to meet his burden on both prongs.

Defendant would pose a danger to public safety if released. Defendant's conduct in this case was not a one time lapse in judgment. Defendant cultivated a sexual relationship with a teenage girl over many months. He even went so far as to ply one of Doe's friends with alcohol to keep that relationship secret for as long as possible. Of particular concern, Defendant cultivated his online relationship with Doe from his home in Canada. Defendant's release plan, were this Court to grant him release, is to immediately return to Canada. Were that to occur, Defendant would be outside the jurisdiction of this Court's supervision, his supervised release would remain in "inactive" status, and there would be no safeguards to ensure that Defendant would not return to victimizing another child.

---

[15] Defendant's motion discusses his desire to be released so that he can assist with the care of his elderly parents during the COVID-19 pandemic. (*See* D.I. 68 at 2-3.) He does not, however, argue that the need to care for his parents is an extraordinary or compelling basis to grant his release. That is likely because the care of elderly parents is not a family circumstance listed by the Guidelines policy statement as rising to an "extraordinary and compelling reason for release. *See* U.S.S.G. § 1B1.13 cmt. n.1(C).

That Defendant maintains a strong support network of friends and family in Canada is not a convincing basis to conclude that Defendant would pose no danger if released. That support system was in place when Defendant made the decision to cultivate a months-long relationship with Doe. Moreover, the kind family man discussed in the letters submitted in support of Defendant's motion describe the very man that committed the acts underlying Defendant's conviction. Although the government does not question the sincerity of those letters, those letters show how Defendant was able to put one face on when interacting with his friends and family while simultaneously grooming a young teenage girl for a sexual relationship. Defendant might pose no danger to his friends and family, but the danger to the next child Defendant encounters online remains a distinct concern to the government.

Nor do the § 3553(a) factors weigh in favor of any sentence reduction. The government's sentencing memorandum, which addressed the § 3553(a) factors in great detail, continues to apply to Defendant's conduct. (D.I. 45, 46.) Although Defendant should be commended for his good behavior in prison and for taking advantage of the educational and vocational opportunities made available to him, such behavior cannot overcome the reprehensible nature of Defendant's actions and the need to deter those who contemplate cultivating sexual relationships with minors on the internet. Defendant's offense merits that he serve the remainder of his sentence in prison.

## IV. CONCLUSION

For the foregoing reasons, and after considering the totality of relevant circumstances, the government respectfully requests that the Court deny Defendant's motion to reduce his sentence.

Respectfully Submitted,

DAVID C. WEISS
United States Attorney


By: */s/ Jesse S. Wenger*
    Jesse S. Wenger
    Assistant United States Attorney

Dated: December 1, 2020